## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL HINES,     :
           :
     Plaintiff  :  No. 3:14-CV-2139
           :
   vs.      :  (Judge Nealon)
           :
CAROLYN W. COLVIN, Acting :
Commissioner of Social Security, :
           :
     Defendant  :

**FILED**
**SCRANTON**

DEC – 9 2015

PER_____
DEPUTY CLERK

## <u>MEMORANDUM</u>

On November 7, 2014, Plaintiff, Michael Hines, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, <u>et seq</u> and U.S.C. § 1381 <u>et seq</u>, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his application for DIB on July 13, 2009, and his application for SSI on July 22, 2009, alleging disability beginning on May 25, 2008, due to migraines, anxiety, a bleeding ulcer, and insufficient aortic valves. (Tr. 195, 217, 228).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on March 19, 2010.  (Tr. 2-11).  On March 23, 2010, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 161).  An initial hearing was held on March 9, 2011, before administrative law judge Richard Zack ("ALJ"), at which Plaintiff and an impartial vocational expert Pat Schiller testified.  (Tr. 77).  The ALJ denied Plaintiff's claim, but the Appeals Council sent the case back for a new hearing.  (Tr. 30).  A second hearing was held on November 19, 2012, before the ALJ, at which Plaintiff and an impartial vocational expert, Josephine Doherty, ("VE"), testified.  (Tr. 30).  On

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on January 21, 2015.  (Doc. 11).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

April 9, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff could perform sedentary work with limitations. (Tr. 6).

On May 13, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 5). On September 24, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on November 7, 2014. (Doc. 1). On January 21, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 10 and 11). Plaintiff filed a brief in support of his complaint on February 17, 2015. (Doc. 12). Defendant filed a brief in opposition on March 20, 2015. (Doc. 13). Plaintiff filed a reply brief on March 21, 2015. (Doc. 14). With permission from this Court, Plaintiff filed a supplemental brief on July 14, 2015. (Doc. 17).

Plaintiff was born in the United States on March 30, 1981, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 142). Plaintiff

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-

completed one (1) year of high school, and can communicate in English. (Tr. 227, 233). His employment records indicate that he previously worked as a welder from 2007-2008. (Tr. 229). The records of the SSA reveal that Plaintiff had earnings in the years 1997 through 2000, 2002 through 2004, and 2006 through 2008. (198). His annual earnings range from a low of no earnings in 2001, 2005, and 2009 to a high of seventeen thousand one hundred fourteen dollars and twenty-eight cents ($17,114.28) in 2007. (Tr. 198). His total earnings during those twelve (12) years were forty-eight thousand nine hundred twenty-six dollars and ninety-seven cents ($48,926.97). (Tr. 198).

In a document entitled "Function Report - Adult" filed with the SSA on September 18, 2009, Plaintiff indicated that he lived in a mobile home with his girlfriend and her children. (Tr. 238). From the time he woke up to the time he went to bed, Plaintiff would brush his teeth, take a shower, watch television, and take naps. (Tr. 238). He had no problem with personal care, prepared meals once or twice a week, mowed the lawn once a week, swept the floors twice a day, drove a car unaccompanied, shopped in stores for personal care and household items and food twice a month for a half hour to an hour, hunted, fished, and watched

---

49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

television. (Tr. 239-242).  When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, completing tasks, or using hands.  (Tr. 243).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, but did need special reminders to take his medicine. (Tr. 240).  He could count change and pay bills, but could not handle a savings account or use a checkbook because he didn't "know how." (Tr. 241).  He could not pay attention for long, his mind wondered, he could not finish what he started, he did not follow written or spoken instructions well, and did not handle stress or changes in routine well. (Tr. 243-244).

Socially, Plaintiff did not go outside often, but did "talk and hang out with [his] family only" several times a week. (Tr. 241-242).  He was able to drive, but when he went out, he did not go out alone because he would "get paranoid." (Tr. 241).  He didn't hunt or fish as often as he used to because if people showed up, he would become paranoid and leave. (Tr. 242).  He had problems getting along with family, friends, neighbors, and others because the he didn't "like to be around people because all they do is stare and talk about [him]." (Tr. 243).  He stated that he didn't talk to people 'that much" since his conditions began, and that he could

not remember names, could not concentrate, could not understand or follow simple

instructions, and could not get along with others because he didn't like people.

(Tr. 243).  Regarding authority figures, he got along with them "fair," but tried to

avoid them.  (Tr. 243).  He was fired from a job because of his short temper.  (Tr.

244).

    Plaintiff stated the following in the "Remarks" section of the Function

Report:

> I suffer from migrain[e] headaches which are blinding at times,
> often give me [an] upset stomach [and] nose bleeds, and its
> uncontrolled by over[-]the[-]counter medication.  I also have
> [an] insufficient valve in my heart which cause[s] high blood
> pressure and hyperlipidema.  I also have uncontrolled anxiety
> which cause[s] me to not go anywhere [and] to not talk to
> anyone besides family members.  This anxiety also causes me
> not to have patience [(sic)] when I go to do something.  When I
> go to do stuff and if it doesn't go my way or it aggravates me, I
> get very mad and I will smash it without thinking twice about
> it.  Another thing is if I try to go out to eat and people are
> staring, I get very paranoid and I will walk out so I don't get
> into trouble.  I have a habit of telling people off if they're (sic)
> staring at me or if they're (sic) talking while looking at me.
> Being around people I don't know makes me paranoid and
> afraid [(sic)] [and] I [would] rather just stay home.

(Tr. 245).

    At his hearing on November 19, 2012, Plaintiff testified that he was

disabled due to severe migraines, depression, anxiety, and chronic pain associated

with Lyme's disease.  (Tr. 32).  Initially, Plaintiff's attorney discussed the findings

prior to the rehearing after the claim was remanded back to the ALJ from the

Appeals Council:

> At prior findings, we did discuss the fact that Mr. Hines has the
> following impairments related to severe migraines, depression,
> anxiety, and chronic pain associated to his Lyme disease
> condition. If we can point out some issues from the last
> hearing, we found that exhibits show that Dr. Campbell stated
> that his prognosis for the migraines was poor, and his
> prognosis for anxiety was guarded, and I believe that's at
> Exhibit 4F. Dr. Friedman, at 7F, stated that the claimant needs
> aggressive psychotherapy and medication, and he was of the
> opinion that he was unable to manage his personal funds, and
> his concentration, persistence, and pace was also poor. The
> claimant stated that the severity of his migraines caused him to
> black out at times, and [he] got dizzy and visually impaired
> from time to time, based on the severity of the migraine. If we
> also look at the medical source statement that was proffered by
> Dr. Llewellyn, who was his treating physician – Llewllyn
> stated that the frequency of his needing to switch positions
> ranged from anywhere from two to four hours at length. He
> also stated that in conjunction with all the restrictions that he'd
> placed on him, it suggested that he restricted him to sedentary
> work at best, with further limitations based on the medical
> source statement. Again, we must consider that during the
> times of flare ups of his Lyme disease and his migraines –
> which are basically unpredictable, they don't have a set pattern
> – he does have visual impairment, weakness, must sit or take a
> nap, or completely isolate himself during those times, and he's
> not a functioning part of society. His prescriptions, as he
> testified to, and again today, do cause tiredness and drowsiness.
> And again, when his migraines and his Lyme disease do act up
> on a weekly to bi-weekly basis, he will be off-task from any
> employment for up to 30 percent of a work day. That would
> leave him unemployable in the national economy, which your
> honor proffered as a hypothetical in the first hearing, and a

vocational expert did agree to that.  Other than that, your
honor, he's here for further questioning today.

(Tr. 31-33).

In terms of day to day life, Plaintiff testified that, on an average day, he
wakes up "stiff as a board," and that he would take medicine to help with that.
(Tr. 34).  He stated that "[s]ometimes from the joints hurting and stuff like that, it
does trigger the migraine."  (Tr. 34).  He also reported taking Xanax for his
anxiety, and that he needed to keep increasing his dose as it was "not really"
helping.  (Tr. 34, 40).  He was not attending therapy for his anxiety due to
financial difficulties.  (Tr. 42).

Regarding his migraines, he would sometimes get two (2) a day, and they
would start with an aura of light flashes and squiggly lines, and then the pain
would increase dramatically.  (Tr. 35).  His migraines occurred "at any time," but
mainly in the afternoon due to the glare of sunlight.  (Tr. 43).  Imitrex and Norco
did not help his migraines.  (Tr. 35-36).  He testified that he had not been seen yet
by a neurologist, but that he had been trying to get an appointment.  (Tr. 39).  He
did not follow any specific diet to prevent his migraines.  (Tr. 37-40).

Regarding his Lyme's Disease, Plaintiff testified that he took Keflex, an
antibiotic prescribed to control the pain and stiffness resulting from this disease,

for twenty (20) days when he had "attacks" of the disease . (Tr. 41). When the attacks came on "full force," Plaintiff was unable to get off the couch for a week. (Tr. 41). His symptoms from the Lyme's Disease included stiffness and pain in his neck, shoulders, lower back, knees, elbows, and collarbone. (Tr. 41, 43).

He indicated that he tried to help out with chores around the house, such as vacuuming. (Tr. 41). He would drive only if he needed to get something and his girlfriend was not there to drive him, but if he went into a store and there were a lot of people at the register, he would leave. (Tr. 42).

## MEDICAL RECORDS

On November 18, 2009, Plaintiff underwent a cardiac ultrasound that was ordered by Janusz Wolanin, M.D., Plaintiff's treating physician since July 15, 2009. (Tr. 394, 400). The ultrasound concluded that Plaintiff had possible bicuspid aortic valve and mild to moderate aortic regurgitation. (Tr. 394).

On July 29, 2009, Dr. Wolanin opined that Plaintiff was temporarily disabled for twelve (12) months or more due to insufficient cardiovascular arteries, migraines, gastric reflux, anxiety, and neuropathy. (Tr. 412).

On December 11, 2009, Plaintiff underwent an examination performed by Dwin Campbell, D.O. (Tr. 282). Plaintiff's chief complaints were migraines and anxiety. (Tr. 282). He reported that he got migraines approximately every two (2)

9

to three (3) days on average, and that his migraines presented with visual auras for about forty-five (45) minutes, and then the pain and vomiting would occur and could sometimes last an entire day. (Tr. 282). He had never tried any preventative medications, but took only Advil, which didn't help. (Tr. 282). As for his anxiety, Plaintiff states that he experienced social anxiety, became very nervous in crowds, and experienced physical symptoms such as heart palpitations and light-headedness. (Tr. 282-283). This anxiety caused an inability to go to the grocery store and made him uncomfortable when there were many people in his house. (Tr. 283). He could not keep eye contact when conversing with others, and was unable to go to restaurants. (Tr. 283). Plaintiff tried Celexa, but it made him too sleepy, and also reported trying Paxil. (Tr. 283). At the time of the exam, he was not taking anything for his anxiety. (Tr. 283). Plaintiff's medications at this appointment included Zocor and Prilosec, and he smoked a pack of cigarettes a day. (Tr. 283). A review of his systems revealed he was positive for visual disturbances associated with his migraines, a heart murmur, fatigue, loss of energy, headaches, and anxiety. (Tr. 283). His physical examination revealed that Plaintiff: (1) was pleasant, awake, alert, in no acute distress, answered questions appropriately in an isolated circumstance, maintained full attention throughout the exam, had excellent personal hygiene, and had intact memory and judgment; (2)

had a soft and non-tender abdomen with positive bowel sounds throughout; (3) could ambulate down the hallway without difficulty, ambulate on his heels and toes without difficulty, squat and rise from squatting position, and get in and out of a chair and on and off the examination table without difficulty; and (4) had negative straight leg raising tests and a five (5) out of five (5) in all areas of the upper and lower extremities. (Tr. 283-284). Dr. Campbell reiterated several times that, in terms of Plaintiff's mental health examination, he was in an isolated environment, and not around any other people at the appointment. (Tr. 284). Dr. Campbell stated that Plaintiff: (1) had migraine headaches that were frequent and debilitating, and stated that Plaintiff's prognosis was poor; and (2) had social anxiety with panic-type symptoms with an overall guarded prognosis. (Tr. 284-285). Dr. Campbell opined that, in a competitive, eight (8) hour workday, Plaintiff: (1) had no limitations for lifting or carrying, standing or walking, sitting, pushing or pulling, or postural activities; (2) had no environmental restrictions; and (3) was not restricted in terms of any other physical functions. (Tr. 286-287).

On December 15, 2009, Plaintiff had a psychological evaluation at Northeast Counseling Services ("NCS"). (Tr. 295). Plaintiff complained of experiencing the following: depression symptoms including sleep disturbances, social withdrawal, severe panic attacks that caused a need to leave places with

more than five (5) people, and decreased motivation; anxiety symptoms including shakiness, sweating, guilt, and heart palpitations; oppositional behavior including swearing; and domestic abuse at the hands of his father. (Tr. 296). His psychosocial stressors included family, relationships, financial difficulties, and physical symptoms such as migraines. (Tr. 296). He had a history of prior psychological treatment, including taking Paxil, seeing different psychological providers, and being hospitalized for suicidal thoughts. (Tr. 298). Plaintiff was referred to "IPE" for therapy with the goal of decreasing his anxiety and depression symptoms. (Tr. 300).

On January 6, 2010, Dr. Wolanin opined that Plaintiff was temporarily disabled for twelve (12) months or more due to severe aortic regurgitation and anxiety, with this assessment being based on physical examinations, a review of Plaintiff's medical records and clinical history, and appropriate tests and diagnostic procedures. (Tr. 395).

On January 8, 2010, Plaintiff underwent an initial psychiatric evaluation at NCS with David Liskov, M.D. (Tr. 302). Plaintiff reported that he had a difficult time being around other people to the extent that he could not shop, go to restaurants, or the movies. (Tr. 302). He also had difficulties with sleeping and some anxiousness in that he could not wait in line and was self-conscious in social

12

situations. (Tr. 302). He reported that his symptoms had been worsening over the last several years, and that he previously took Paxil, but it made him tired, and Celexa, but that helped only "a little bit." (Tr. 302). His psychiatric history was reviewed, and included a hospitalization due to suicidal thoughts, a diagnosis of Social Anxiety with Adjustment Disorder, and a course of treatment at NCS from 1996 to 2006. His mental status examination indicated that Plaintiff was alert, very pleasant, anxious, and somewhat guarded, and that he had good judgment, grooming, and hygiene. (Tr. 303). He denied experiencing suicidal or homicidal ideations, hallucinations, delusions, or paranoid thinking. (Tr. 303). His responses to the questions indicated that he had no difficulties intellectually or with orientation or memory. (Tr. 303). His Axis I diagnosis included Social Phobia and Chronic Generalized Anxiety Disorder, and his Global Assessment Function ("GAF")[7] was fifty (50) to fifty-five (55). (Tr. 303). Plaintiff was

---

7. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level

prescribed Celexa with a gradual upward titration for his depression and anxiety. (Tr. 303).  He was recommended for outpatient psychiatric treatment at NCS with a follow-up in four (4) weeks to assess his medication.  (Tr. 304).

On January 12, 2010, Plaintiff underwent an echocardiogram for a bicuspid aortic valve.  (Tr. 290).  The results of this test were that Plaintiff had a bicuspid

---

of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  Id.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id.  Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed.  Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013).  As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013).

aortic valve with a trace to mild amount of aortic insufficiency and mild dilation of the aortic annulus. (Tr. 291). It was recommended that Plaintiff undergo a baseline CT scan of the chest to assess the aortic root diameter, and schedule a follow-up "in anticipation of dilation of the root and possible worsening aortic insufficiency at a later date." (Tr. 291).

On January 19, 2010, Plaintiff had an outpatient psychotherapy appointment at NCS. (Tr. 305). His mental status exam revealed the following: a neat appearance; good hygiene; normal motor movements; a cooperative manner; appropriate speech; a euthymic mood; intact and logical associative processes; a related affect; unimpaired recent and remote memory; good insight and judgment; average intelligence; present impulse control; good motivation; an absence of hallucinations, delusions, suicidal thoughts, and homicidal thoughts; and orientation to person. (Tr. 307). His treatment objectives included decreasing his anxiety in social situations, and his treatment plan included using his cognitive behavior therapy workbook and participating in social situations five (5) to seven (7) times a week. (Tr. 306). He was to attend therapy every week for one (1) hour. (Tr. 306).

On January 25, 2010, Plaintiff had an appointment with consultative examiner Jeffery Fremont, Ph.D. (Tr. 309). Dr. Fremont noted: that Plaintiff's

15

appearance and dress were consistent with his age, occasion, and weather; that there was nothing unusual about his posture, gait, manners, or hygiene; and that he was cooperative and self-sufficient. (Tr. 309). Plaintiff described his anxiety as causing a light-headed, faint feeling. (Tr. 309). He also revealed that he had to keep things in "equal distance from each other" and would wake up and check appliances in his house at night, which Dr. Fremont stated was a result of Obsessive Compulsive Disorder. (Tr. 310). Plaintiff stated that the recent therapy at NCS was helping, but that he discontinued Celexa because it seemed to exacerbate his migraines. (Tr. 310). In addition to migraines, he also suffered from heart valve regurgitation. (Tr. 310). His mental status examination indicated that Plaintiff was alert and oriented in all three (3) spheres, had intact cognition, had improved sleep with the recent Ambien prescription, had no problems with appetite, had no difficulties with his behavior or psychomotor activity, had speech within normal limits, had a good mood and broad affect, had a productive thought process with continuity, did not have language impairments, had a preoccupation as a consequence of his Obsessive Compulsive Disorder, had a fund of information that was below average, had fair concentration, had intact remote and recent memory, had fair social judgment and limited insight, and appeared to be reliable. (Tr. 310-311). Plaintiff's Axis I diagnosis included anxiety, Obsessive

16

Compulsive Disorder and Alcohol Abuse, his Axis III diagnosis included migraine headaches and heart valve regurgitation, and his GAF was fifty (50). (Tr. 311-312). His prognosis was "favorable with aggressive psychotherapy and appropriate medication." (Tr. 312). Furthermore, "[t]he effect of the impairment indicates that he is unable to shop by himself and must be accompanied by his girlfriend . . . [but] is able to cook and clean." (Tr. 312). Dr. Fremont opined that Plaintiff had the following limitations as a result of his impairments: (1) Plaintiff's concentration, persistence, and pace were relatively poor; (2) Plaintiff's social functioning was almost non-existent; (3) Plaintiff's ability to make occupational adjustment to follow work rules, to relate to co-workers, to use judgment,  to interact with supervisors, to understand, remember and carry out simple job instructions, to make personal social adjustments and maintain personal appearance, to behave in an emotionally stable manner, and to demonstrate reliability were fair; and (3) Plaintiff's ability to deal with the public, to deal with work stress, function independently, to maintain attention and concentration, to make performance adjustments, understanding, remembering and carrying out complex job instructions, to understand, remember, and carry out detailed but not complex job instructions, and to relate predictably in social situations were poor. (Tr. 312-313). Lastly, Dr. Fremont opined that Plaintiff could not manage benefits

in his own best interest.  (Tr. 313).

On March 3, 2010, Peter Garito, Ph.D. completed a Psychiatric Review
Technique.  (Tr. 332).  Dr. Garito indicated that Plaintiff had an Anxiety-Related
Disorder under Impairment Listing 12.06 due to Social Phobia, Generalized
Anxiety Disorder, and Obsessive Compulsive Disorder, but that his impairment
did not precisely satisfy the criteria to be presumptively disabled under Listing
12.06.  (Tr. 337).  Dr. Garito also indicated that Plaintiff had a Substance Abuse
Addiction Disorder under Listing 12.09, but again, when properly evaluated under
Listing 12.06, did not precisely satisfy the criteria to be presumptively disabled
under Listing 12.09.  (Tr. 340).  Regarding the "B" criteria for Listings 12.06 and
12.09, Dr. Garito opined that Plaintiff had mild limitations in restrictions of
activities of daily living, moderate limitations in difficulties in maintaining social
functioning and in maintaining concentration, persistence, or pace, and no
repeated episodes of decompensation.  (Tr. 342).  He also opined that Plaintiff's
impairments did not meet the "C" criteria for Listings 12.06 and 12.09.  (Tr. 343).

Dr. Garito also completed Mental Residual Functional Capacity Assessment
for Plaintiff on March 3, 2010.  (Tr. 328).  Dr. Garito opined that Plaintiff had the
following limitations as a result of his anxiety-related and substance addiction
disorders: (1) no significant limitations in his ability to remember locations and

18

work-like procedures, to understand, remember and carry out very short and

simple instructions, to perform activities within a schedule, to maintain regular

attendance, and be punctual within customary tolerances, to sustain an ordinary

routine without special supervision, to work in coordination with or proximity to

others without being distracted by them, to make simple work-related decisions, to

complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods, to ask simple questions or request

assistance, to accept instructions and respond appropriately to criticism from

supervisors, to get along with coworkers or peers without distracting them or

exhibiting behavioral extremes, to maintain socially appropriate behavior and to

adhere to basic standards of neatness and cleanliness, to be aware of normal

hazards and take appropriate precautions, to travel in unfamiliar places of use

public transportation, and, lastly, to set realistic goals or make plans

independently; and (2) moderate limitations in his ability to understand, remember

and carry out detailed instructions, to maintain attention and concentration for

extended periods, to interact appropriately with the general public, and to respond

appropriately to changes in the work setting. (Tr. 328-329). In arriving at these

limitations, Dr. Garito took Dr. Fremont's opinion into account, giving it only

partial weight because it was "without substantial support from the other evidence of record, which renders it less persuasive." (Tr. 331).  Ultimately, Dr. Garito concluded that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment. (Tr. 331).

On March 17, 2010, Theodore Waldron, D.O. completed a Physical Residual Functional Capacity Assessment. (Tr. 345).  Dr. Waldron stated that Plaintiff's primary physical diagnosis was migraine headaches, and the secondary diagnosis was "stomach problems." (Tr. 345).  Dr. Waldron opined that, in a competitive, eight (8) hour workday, Plaintiff could: (1) occasionally lift and/ or carry one hundred (100) pounds or more; (2) frequently lift and/ or carry fifty (50) pounds or more; (3) stand and/ or walk and sit for about six (6) hours; and (4) engage in unlimited pushing and/ or pulling. (Tr. 346).  Plaintiff had no limitations regarding climbing, balancing, stooping, kneeling, crouching, crawling, reaching in all directions, handling, fingering, feeling, seeing, hearing, or speaking  (Tr. 347-348).  In terms of environmental limitations, Plaintiff had to avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. 348).  Dr. Waldron stated that there were treating or examining source statements regarding Plaintiff's physical capacities in the file,

and that there were not significantly different from his findings. (Tr. 349).  He

stated that Plaintiff's "gross general exam was normal," that he only used over-

the-counter medications, and that he had mild aortic insufficiency. (Tr. 350).  He

also found Plaintiff's allegations to be partially credible. (Tr. 350).

On July 23, 2010, after Plaintiff's June 12, 2010 appointment with Janusz

Wolanin, M.D., Dr. Wolanin wrote a letter to an undisclosed person that stated

that Plaintiff was recently diagnosed with Lyme's disease that would cause

Plaintiff to suffer from long-term pain, weakness, fevers, chronic fatigue, joint

pain, and red skin blotches. (Tr. 364).  However, Dr. Wolanin did not complete a

medical source statement of Plaintiff's ability to perform work-related physical

activities. (Tr. 370).

On February 9, 2011, Dr. Wolanin, Plaintiff's treating physician, completed

a medical source statement of Plaintiff's ability to perform work-related activities.

He opined Plaintiff: (1) could occasionally lift and/ or carry up to ten (10) pounds

and never lift and/ or carry anything heavier than that; (2) could sit for four (4)

hours in an eight (8) hour workday without interruption; (3) could stand and walk

for four (4) hours without interruption at one time, but could only and walk stand

for two (2) hours in an eight (8) hour workday; (4) could frequently finger and feel

with his left and right hands; (5) could occasionally reach, handle and push/ pull

21

with his right and left hands; (6) could occasionally engage in the operation of foot controls for both his left and right foot; (7) could occasionally climb stairs, ramps, ladder, and scaffolds, balance, stoop, kneel, crouch, and crawl; (8) could ambulate without using a wheelchair, walker, or cane; (9) could walk a block at a reasonable pace on rough or uneven surfaces; (10) could climb a few steps at a reasonable pace with the use of a single hand rail; (11) could prepare a simple meal and feed himself; (12) could care for his personal hygiene; and (13) could sort, handle, and use paper/ files. (Tr. 428-431, 433). Dr. Wolanin also opined that Plaintiff's migraines caused an inability to avoid ordinary hazards in the workplace and to read small print. (Tr. 431). In terms of environmental limitations, Dr. Wolanin stated that Plaintiff could never tolerate unprotected heights, could tolerate only moderate (office level) noise, and could occasionally tolerate moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations. (Tr. 432).

On September 12, 2012, Plaintiff had an appointment with Dr. Wolanin for a refill of his prescription for migraine headaches. (Tr. 437). His medications list included Inderal, Alprazolam, Nicoderm, Sumatriptan Succinate, Dexilant, and Simvastatin. (Tr. 437).

On October 22, 2012, Plaintiff had an appointment with Dr. Wolanin for a

follow-up regarding his Lyme's disease and increased anxiety. (Tr. 438). Plaintiff's exam revealed normal gait, full range of motion and normal muscle tone bilaterally in the upper and lower extremities, a normal mood and affect, intact memory, attention within normal limits, and normal coordination. (Tr. 439). Plaintiff was assessed as continuing to have anxiety, migraines, and hyperlipidemia. (Tr. 439). Plaintiff's medications remained unchanged from his prior appointment. (Tr. 439).

On December 6, 2012, Plaintiff underwent a consultative examination performed by Dr. Fremont. (Tr. 444). Dr. Fremont's exam revealed that Plaintiff was alert and oriented in all three (3) spheres, and presented with intact cognition, appropriate posture and hygiene, sporadic eye contact, appropriate behavior and psychomotor activity, normal speech, an anxious and depressed mood, a flat affect, a continued and productive stream of thought, intact remote, recent, and past memory, appropriate social judgment, and minimal insight without reliability. (Tr. 445-446). His Axis I diagnosis were anxiety and depression, his Axis III diagnosis was migraine headaches, and his GAF was fifty-two (52). (Tr. 446). His prognosis was that he would greatly improve with treatment, and that he was "able to manage benefits in a competent manner." (Tr. 446). Dr. Fremont opined that Plaintiff had the fair ability to do the following: follow work rules; relate to

coworkers; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; understand, remember, and carry out simple job instructions; maintain personal appearance; behave in an emotionally stable manner; relate with people in social situations; and demonstrate reliability. (Tr. 447-448).  Dr. Fremont also opined that Plaintiff was poor in his ability to understand, remember, and carry out complex job instructions and detailed but not complex job instructions.  (Tr. 447).

On December 28, 2012, Plaintiff underwent a disability evaluation performed by Vincent Digiovanni, M.D.  (Tr. 451).  He opined, after examining Plaintiff that, in an competitive eight (8) hour workday, five (5) day workweek, Plaintiff: (1) could occasionally lift and/ or carry up to twenty (20) pounds; (2) could stand and/ or walk for one (1) to two (2) hours; (3) could sit for six (6) hours; (4) could engage in unlimited pushing and/ or pulling; (5) could occasionally bend, kneel, stoop, crouch, balance, and climb; (6) could engage in reaching, handling, fingering, feeling, seeing, hearing, speaking, and tasting/ smelling; and (7) should avoid heights, moving machinery, and vibration.  (Tr. 456-457).

On January 29, 2013, Plaintiff had an appointment with Neurologist Kenny Alan Schwartz, M.D. with Geisinger Medical Group for a neurological evaluation

due to his migraines. (Tr. 466). Dr. Schwartz recommended that Plaintiff limit over-the-counter pain medications to two (2) to three (3) days a week, begin taking magnesium supplements, undergo an MRI of the brain, and return for a follow-up two (2) or three (3) weeks after the MRI. (Tr. 467).

On February 7, 2013, Plaintiff had an MRI of the brain performed. (Tr. 468). This study showed: (1) no acute pathology, space-occupying mass or pathological enhancement; (2) tiny foci of subtle T2 hyperintensity in the cerebral white matter that were nonspecific and have been reported in those suffering from migraine headaches; and (3) bilateral paranasal sinus mucosal disease. (Tr. 468).

On February 12, 2013, Dr. Schwartz wrote a prescription for Topomax for Plaintiff's migraine headaches. (Tr. 469).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

27

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of June 30, 2009. (Tr. 12). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of May 25, 2008. (Tr. 12).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "migraine headaches, aortic valuve insufficiency, anxiety, and depression (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

and 416.926).  (Tr. 12).

At step four, the ALJ determined that Plaintiff had the RFC to perform

sedentary work with limitations. (Tr. 15). Specifically, the ALJ stated the

following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform sedentary work
> as defined in 20 CFR 404.1567(a) and 416.967(a). He could
> lift 10 pounds occasionally, 2-3 pounds frequently. With
> normal breaks and lunch periods, he could sit for about 6 out of
> 8 hours in a given workday and stand or walk for about 2 out of
> 8 hours in a given workday. However, he needs some sit/stand
> flexibility periodically, and that could be accommodated in
> addition to normal breaks and lunch periods by [Plaintiff] being
> on his feet for 10-15 minutes at a time and then resuming a
> seated position. In terms of a work environment, he could not
> work in occupations where he has to do stressful activities, like
> climbing ladders, scaffolds, being around unprotected heights,
> and being around unprotected, dangerous machinery. He could
> not work, essentially, in a work setting outdoors, where he may
> be exposed to intense sunshine and glare unless the job allowed
> him to wear protective lenses as part of his job duties to
> prevent the continuous exposure to bright sun and glare. In
> terms of actual walking and distance when he is on his feet, he
> could walk around immediate workstation, up to the equivalent
> of one block at a time. From a nonexertional standpoint, and
> dealing with the residual of migraines and dealing with anxiety,
> these conditions would prevent [Plaintiff] from doing a highly
> detailed, a highly complex, or a highly stressful occupation.
> He could understand, remember, and carry out simple
> instructions and make simple work-related decisions. He could
> respond appropriately to co-workers and supervisors if he only
> needed occasional contact with those individuals. He could
> respond appropriately to the work setting just described and he

could handle changes that typically take place in that type of
work setting.

(Tr. 14).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the her age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 20-21).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between May 25, 2008, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 22).

**<u>DISCUSSION</u>**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ's RFC

analysis is not supported by substantial evidence because it failed to include

reaching and handling limitations as opined by Dr. Wolanin and limitations with

the public as opined by Dr. Fremont, which were limitations that were then

omitted from the hypotheticals presented to the VE; (2) the ALJ's determination

regarding Plaintiff's credibility is not supported by substantial evidence; and (3)

the ALJ erred in not explaining why Plaintiff's migraines did not meet any

32

requisite Listings under Listing 11.00, et seq., and more specifically Listing 11.03.

(Doc. 12, pp. 7-18); (Doc. 17, pp. 1-6).  Defendant disputes these contentions.

(Doc. 13, pp. 9-23).

### 1.    **RFC Analysis and VE Hypotheticals**

Plaintiff argues that the ALJ erred in failing to include two (2) limitations

from Plaintiff's RFC, including one that limited Plaintiff to only occasional

reaching and handling as opined by Dr. Wolanin and one that limited Plaintiff's

interaction with the public as opined by Dr. Fremont.  (Doc. 12, pp. 7-13).

It is within the ALJ's authority to determine which medical opinions he

rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. §

416.927.  The ALJ is permitted to give great weight to a medical expert's opinion

if the assessment is well-supported by the medical evidence of record.  See

Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding

that there was substantial evidence to support the ALJ's RFC determination that

the plaintiff could perform light work, even though this determination was based

largely on the opinion of one medical expert, because the medical expert's opinion

was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S.

Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).  Regardless, the ALJ has the duty to

adequately explain the evidence that he rejects or to which he affords lesser

weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Regarding the relevant medical opinion evidence, the ALJ gave great weight to several opinions. The ALJ gave great weight to Dr. Wolanin's opinion rendered on February 9, 2011, in which Dr. Wolanin opined that Plaintiff: (1) could occasionally lift and/ or carry up to ten (10) pounds and never lift and/ or carry anything heavier than that; (2) could sit for four (4) hours in an eight (8) hour workday without interruption; (3) could stand and walk for four (4) hours without interruption at one time, but could only and walk stand for two (2) hours in an eight (8) hour workday; (4) could frequently finger and feel with his left and right hands; (5) could occasionally reach, handle and push/ pull with his right and left hands; (6) could occasionally engage in the operation of foot controls for both his left and right foot; (7) could occasionally climb stairs, ramps, ladder, and scaffolds, balance, stoop, kneel, crouch, and crawl; (8) could ambulate without

using a wheelchair, walker, or cane; (9) could walk a block at a reasonable pace on rough or uneven surfaces; (10) could climb a few steps at a reasonable pace with the use of a single hand rail; (11) could prepare a simple meal and feed himself; (12) could care for his personal hygiene; and (13) could sort, handle, and use paper/ files. (Tr. 428-431, 433) (emphasis added). The ALJ concluded that this opinion was "consistent with the objective evidence of record, including findings upon examination and diagnostic testing." (Tr. 19).

The ALJ also gave great weight to the opinion of Dr. Fremont rendered on December 6, 2012. (Tr. 19, 447-448). Dr. Fremont opined that Plaintiff had the fair ability to do the following: follow work rules; relate to coworkers; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; understand, remember, and carry out simple job instructions; maintain personal appearance; behave in an emotionally stable manner; relate with people in social situations; and demonstrate reliability. (Tr. 447-448) (emphasis added). Dr. Fremont also opined that Plaintiff was poor in his ability to understand, remember, and carry out complex job instructions and detailed but not complex job instructions. (Tr. 447).

Additionally, the ALJ gave great weight to the opinion of Dr. Garito rendered on March 3, 2010, in the Mental RFC Assessment form and the

35

Psychiatric Review Technique form, stating, "The undersigned agrees with these opinions and finds them to be well supported by the objective evidence of record, including findings upon examination." (Tr. 17-18). Dr. Garito opined that Plaintiff had moderate limitations in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (Tr. 328-329) (emphasis added).

As stated, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz, 577 F.3d at 505-06 (3d Cir. 2009). In the case at hand, the ALJ stated that the opinions rendered by Dr. Wolanin, Dr. Fremont, and Dr. Garito, all of which were given great weight, were supported by the objective medical evidence and consistent with the record. (Tr. 17-19). Therefore, this Court is left to wonder why the ALJ would exclude the limitations of occasional reaching and handling and limited interaction with the public from Plaintiff's RFC, especially in light of the fact that the ALJ stated that these opinions were supported by and consistent with the record, because the ALJ has failed to provide an explanation for these omissions.

Defendant asserts explanations as to why these limitations were not supported by the record and required only conservative treatment. (Doc. 13, pp. 9-

16). However, upon review, these explanations were never given by the ALJ in his opinion, but rather are post-hoc rationalizations asserted by Defendant. It is well-established that, in reviewing an administrative law judge's decision, the District Court cannot supply its own reasons to explain or support the administrative law judge's decision. Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001). Rather, the District Court is permitted to analyze only those explanations that the administrative law judge actually provides for in his decision. Id. "In the absence of such an [explanation], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett, 220 F.3d at 121. As such, because the ALJ did not provide an explanation as to why these limitations, which were contained within opinions the ALJ gave great weight to and held were supported by and consistent with the record, were not included in the RFC, this Court is not permitted to review these post-hoc rationalizations provided by Defendant, and substantial evidence does not support the ALJ's RFC determination due to the exclusion of these limitations.

Furthermore, the ALJ failed to included these two (2) limitations in the hypotheticals posed to the VE at the administrative hearing. (Tr. 46-56). The United States Court of Appeals for the Third Circuit has held in "the clearest of terms" that a hypothetical question must include all of a claimant's functional

limitations which are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir. 2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). A hypothetical that omits limitations is defective, and the answer thereto cannot constitute substantial evidence to support denial of a claim. Ramirez, 372 F.3d at 553-55. However, "[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). When an ALJ's hypothetical question to a vocational expert sets forth the Plaintiff's limitations, as supported by the record, the vocational expert's response may be accepted as substantial evidence in support of the ALJ's determination that the Plaintiff is not disabled. See Chrupcala, 829 F.2d at 1276.

While there is logical appeal to Defendant's assertion that the omissions from the hypotheticals posed to the VE are excused by the harmless error, the fact remains that the DOT descriptions of the jobs the VE said Plaintiff could perform (in response to the first hypothetical that did not include the two (2) limitations Plaintiff asserts should have been included) do not provide clarity as to all types of social interaction these jobs would potentially entail, including, most notably, interaction with the public. See, e.g., Decker v. Colvin, U.S. Dist. LEXIS 1469, at

*4-6 (W.D. Pa. Jan. 7, 2015) (remanding because the failure of the ALJ to include moderate limitations in social functioning in the hypothetical question posed to the vocational expert rendered the question "'deficient,'" such that it could not "'be considered substantial evidence'" and was not harmless error) (quoting Chrupcala, 829 F.2d at 1276); see also Lam v. Astrue, 2011 U.S. Dist. LEXIS 53229, at *14 (E.D. Pa. Mar. 31, 2011) ("Until the ALJ forecloses the possibility that the VE could have changed his testimony if the ALJ had included limitations pertinent to the ALJ's own finding of 'moderate' limitations in social functioning, the VE's answer to the hypothetical as posed cannot be said to constitute substantial evidence upon which the ALJ can properly rely.").

As discussed, the ALJ clearly found that Plaintiff had moderate limitations in social functioning as evidenced by the great weight he placed on the opinions of Dr. Fremont, Dr. Garito, and Dr. Wolanin, opinions which he stated were consistent with and supported by the evidence of record. More specifically, the ALJ stated the following:

> However, great weight is afforded to Dr. Garito's other Psychiatric Review Technique form dated March 3, 3010 [sic], which covers the time period to the present, as well as his Mental [RFC]. In these assessments, Dr. Garito opines that [Plaintiff] . . . moderate difficulties in maintaining social functioning . . . The undersigned agrees with these opinions and finds them to be well supported by the objective evidence

of record, including findings upon examination.  As such, great weight is afforded to these opinions.

---------------------------------------------------------------------------

Greater weight is afforded to Dr. Fremont's more recent GAF score of 52, as well as his assessed limitations (Exhibit 24F), and the GAF score ranging from 50-55 provided by Northeast Counseling Services (Exhibit 6F).  A GAF score within the range of 51-60, according to the American Psychiatric Association guidelines, indicates the existence of an impairment that would produce only moderate symptoms such as flat affect, circumstantial speech or occasional attacks or only moderate difficulty in social, occupational, or school functioning such as few friends, or conflicts with peers or co-workers.  This [is] supported by the objective evidence of record, including findings upon mental status examinations . . . As such, greater weight is afforded to these GAF scores and limitations.

(Tr. 17-19).  The ALJ therefore found that Plaintiff had moderate limitations in social functioning, and placed great weight on the opinions that concluded as such.  In accordance with the aforementioned Third Circuit Court of Appeals precedent, the ALJ's RFC determination and questions posed to the VE and the resulting responses from the VE are not supported by substantial evidence.  As such, remand is warranted because the failure of the ALJ to include moderate limitations in social functioning in the hypothetical question posed to the VE rendered the question "'deficient,'" such that it could not "'be considered substantial evidence'" and was not harmless error.  <u>Chrupcala</u>, 829 F.2d at 1276.

**CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: December 9, 2015

/s/ **William J. Nealon**
**United States District Judge**